# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

WILLIAM BRINSON BALL

    Plaintiff,

v.                                                                Case No. 5:25-cv-00123-TPB-PRL

DONOVAN DAVIS, JR., ET AL.,

    Defendants.

_____/

## DONOVAN DAVIS, JR.'S AND CHRISTIANE DAVIS'S MOTION FOR LEAVE TO FILE A SUR-REPLY TO PLAINTIFF'S REPLY

    Donovan Davis, Jr., and Christiane Davis (herein "Defendants") respectfully request leave to file a sur-reply to Plaintiff's Reply. Good cause exists for allowing a sur-reply. In Plaintiff's Reply, Plaintiff misrepresented material facts and fabricated arguments that contradict his own previous representations made in this court and those he swore to in other federal courts. In addition, Plaintiff also misstated governing authority. As such, a sur-reply is necessary to correct the record, clarify the applicable law, and prevent unfair prejudice. Allowing Defendants to file a brief sur-reply will assist the Court in resolving the issues on a complete and accurate record and will not cause delay or prejudice to Plaintiff.

    Respectfully submitted on this 23RD day of January 2026 by:

Donovan Davis, Jr.
218 Davis Ln.
Palm Bay, FL 32909

Christiane Davis
218 Davis Ln.
Palm Bay, FL 32909

## CERTIFICATE OF SERVICE

Donovan Davis, Jr., and Christiane Davis hereby certify that a copy of the motion with sent to the Plaintiff at his residence, Federal Correctional Complex Coleman – Low P.O. Box 1031 Coleman, FL. 33521.

Donovan Davis, Jr.
218 Davis Ln.
Palm Bay, FL 32909

Christiane Davis
218 Davis Ln.
Palm Bay, FL 32909

ATTACHMENT "1"

## AFFIDAVIT OF WILLIAM BRINSON BALL

I, William Brinson Ball, being over the age of 18 and of sound mind, herby declare the following:

### I. In General

1. My full name is William Brinson Ball. My USMS number is 70048-018.

2. I currently reside at the Federal Correctional Complex (Low Custody), in Coleman, Florida.

3. I am currently serving a 262-month sentence for charges relating to 18 U.S.C. §§ 2422(b) and 2252(a)(1) and (b)(1).

### II. Before Arrest

#### A. Background

4. I am a citizen of the United States. See Dkt. 20 at 4 and PSR at 3.

5. Although I am a U.S. citizen, I lived and worked overseas from August of 2004 until my arrest on February 14, 2018. Id; PSR ¶ 92.

6. I worked as an international school teacher in Japan, Qatar and the United Arab Emirates. PSR ¶¶ 109-112.

7. I have been married to my wife, Kumi, since December 17, 2005, and I have a son, Max, who was born on July 4, 2007. Id. ¶¶ 90-91.

8. I cannot swim, and I easily get seasick.

9. I have no prior criminal history. See Dkt. 57 at 10 and PSR ¶ 80.

10. I have never sexually abused another person---especially not a child. See Dkt. 20 at 13 and App. 276-282.

11. My mother, Joe Etta, died on October 30, 2015. See PSR ¶ 87.

12. Around the fall of 2016, I began my involvement with child pornography online. Dkt. 57 at 40; see also PSR ¶ 99 and App. 277.

#### B. Encounter

13. On or around January 10, 2018, using the social messaging application "Kik", I messaged someone whom I believed to be "B.E." Dkt. 36 at 21; see also PSR ¶ 15.

14. "B.E"'s account was under government control. PSR ¶ 14.

15. On or around January 26, 2018, I deleted all known child pornography from my iPhone and cloud storage.

16. On or around January 30, 2018, "B.E." offered to introduce me to a person who conducted what he described as a "Trip to Nowhere". See Dkt. 36 at 23 and App. 85.

17. Subsequently, "B.E." introduced me to "Nick Andrews[1]", on kik. Dkt. 36 at 23; see also PSR ¶ 20.

18. Homeland Security Investigations (hereinafter "HSI") based their investigation out of its Tampa, Florida office. Dkt. 36 at 21.

19. In exchange for $5,000.00, Agent Nicholas Anderson, via Skype, offered to provide access to a minor in international waters. App. 97; see also Dkt. 36 at 26.

20. Agent Anderson assured me that the sexual activity he offered would be legal, since it would occur either "12 miles or 50 [miles]" off the Florida coast, in international waters. App. 87.

21. Agent Anderson further assured me that law enforcement would not detect the boat before it reached international waters. App. 95-96.

22. Based on Agent Anderson's assurances, I sent the agreed amount to his persona's Bank of America account. App. 119; 123-125; see also App. 59-60.

23. After sending payment, PSR ¶¶ 27-28, I booked a flight with Emirates Airlines from Dubai, UAE to Orlando, Florida. App. 141.

### C. Prior to Arrest

24. On Tuesday, February 13, 2018, at approximately 7:15PM Eastern Standard Time, I boarded Emirates flight Ek219 in Dubai. App. 141.

25. I continuously drank alcohol until the last hour or so of the 16-hour flight.

26. I arrived at Orlando International Airport at approximately 9:45AM on Wednesday, February 14, 2018. See App. 141.

---

[1] The "Nick Andrews" person was played by two agents: one (UCA1) on kik, and another (UCA2 – Nicholas Anderson) in person. Dkt. 36 at 22-23.

27. After clearing customs, I picked up a Hertz rental vehicle from the airport terminal, App. 143-145, and drove to Tampa. See Dkt. 36 at 24.

28. En route to Tampa, I drove through several toll booths.

29. I left the toll booth receipts in the rental vehicle after my arrest. App. 146.

30. On the way to Tampa, I stopped in Haines City for lunch. Dkt. 64-3 at 25.

31. Upon reaching Tampa, I stopped at the Holiday Inn Hotel on North Florida Avenue, at approximately 1:00PM.

32. While in the parking lot, I looked up the location of Todd's Adult Store---- the store Agent Anderson told me to visit. See App. 64.

33. Agent Anderson asked me to go there to purchase items for the "Trip to Nowhere". App. 66 and 160.

34. Todd's was at the intersection of Nebraska and Fletcher Avenues. App. 159-160.

35. To reach Todd's from the Holiday Inn, I had to make a 25-mile round trip drive to the other side of Tampa.

36. As a result, I did not return to the Holiday Inn until after 2PM-more than an hour later.

37. I attempted to check-into the hotel, but my bank declined my credit card.

38. Subsequently, I used the hotel's ATM to withdraw the cash I needed.

39. After several failed attempts, I was able to withdraw the cash I needed.

40. I paid for the room, then walked to the hotel bar, located in the lobby, for a pint of beer.

41. I spoke with the bartender while drinking the beer.

42. The bartender was a middle-age white female with an Australian accent.

43. I ordered a second pint "for the road", then proceeded to my room.

A-3

44. As I prepared to take a shower, Agent Anderson sent me a message, asking to meet "ASAP".

45. I quickly drank the second pint and took a brief shower.

46. I was disoriented due to the lack of sleep, jetlag, and alcohol.

47. I left the Holiday Inn at approximately 2:45PM.

48. Having to rush to the meeting point exacerbated my disorientation.

49. This was my first time in Tampa.

50. I struggled to find roads and landmarks quickly without getting lost or having an accident.

51. I arrived at the meeting point just after 3PM.

52. The meeting point, chosen by Agent Anderson, was a City of Tampa municipal parking lot, located on West Tyson Avenue. App. 153; see also App. 80-81.

53. Adjacent to the parking lot was a Hawaiian-themed bar named the Hula Bay Club, and a marina which Agent Anderson called the "High and Dry Marina". App. 80.

54. I saw a boat matching the description Agent Anderson gave, App. 86-87, the one purportedly for use in the "Trip to Nowhere". App. 190-191; see also App. 165.

55. I saw this boat berthed approximately 200 feet to the left of the Hula Bay Club.

### D. The Arrest

56. Agent Anderson waited for me in the parking lot. He purportedly arrived at the meeting point in a black, late model Range Rover.

57. Agent Anderson sat on the opened lower lip of the Range Rover's trunk door and waved as my vehicle approached him. See Video[2]

58. After exchanging greetings, Agent Anderson searched my vehicle. App. 160.

59. Subsequently, Agent Anderson led me in the direction of the boat. See Video.

---

[2] Paragraphs containing a "video" citation reference the video feed of the recording. As these portions of the video contain no dialogue, they do not show up in the "video" transcript.

60. Agent Anderson stopped in an open space of the parking lot and pointed at some buildings on the other side of Tampa Bay. App. 163-164.

61. After Agent Anderson pointed, no fewer than five HSI agents "arrested" Agent Anderson, and actually arrested me. App. 163-164; see also Video.

62. At least one HSI agent stood behind me and pointed a gun at my back. App. 165; see also Video.

63. This HSI agent instructed me to "[c]ross [my] feet", and to "[p]ut [my] hands out to the side as he placed me in a submissive position. App. 164-165.

64. As the agents moved me in this position, I heard Agent Tavey Garcia's voice coming from the direction of the boat. App. 165.

65. Agent Garcia called out, "[h]ow old is that kid on the boat?" App. 165.

66. Subsequently, an agent placed my hands behind my back and restrained me with handcuffs. App. 165; see also Video.

67. An agent led me to a white, unmarked, mid-sized Chevrolet sedan with black interior. App. 166; see also App. 174.

68. The nose of the sedan faced in the direction of the arrest point. See App. 290.

### III. The Interrogation

69. After the agent placed me inside the vehicle, Agents Garcia and Ryan Albritton introduced themselves. App. 174.

70. Agent Garcia sat in the driver's seat of the vehicle. See App. 290.

71. Agent Albritton stood outside the vehicle, on the other side of the front passenger door. See App. 290.

72. I was boxed inside a locked vehicle and could not move. See App 290.

73. I was handcuffed, with two agents less than one foot apart on either side of me.

74. I most certainly did not feel free to move about or leave.

75. The front passenger window was open.

76. I could hear Agent Albritton, as well as the agents who were attempting to "detain" Agent Anderson.

77. I could also hear "The Shape of You" by Ed Sheeran coming from the Hula Bay Club. See App. 290.

78. Subsequently, Agent Garcia read me my Miranda rights. App. 175.

79. Once Agent Garcia confirmed that I understood these rights, I immediately asked to "speak[] to an attorney." App. 171.

80. Agent Garcia clarified my request for counsel by asking, "[o]kay. So, you'd like to consult with an attorney first?" App. 176.

81. I replied, "[y]es." App. 176.

82. After I requested counsel, Agent Garcia nodded in the direction of the struggle to "restrain" Agent Anderson. See App. 290.

83. Agent Albritton stepped in, and said that either "[me] or him" was "going to talk". App. 175.

84. I understood Agent Albritton's statement to mean that the suspect who spoke up first would be treated more favorably, whereas the one who did not talk would be treated more harshly.

85. Agent Garcia subsequently said, "[i]f you would like to continue [talking], we would definitely be willing to listen to what you know about this-this man." App. 175.

86. As Agent Garcia asked me what I knew about Agent Anderson, I heard him scream in pain. App. 175.

87. As I thought about how to respond to Agent Garcia, I heard an agent tell Agent Anderson that they were going to "hurt [him] bad." App. 176.

88. I believed that if I didn't "volunteer" information, these same agents would have taken me somewhere out of view – perhaps behind the warehouse – and hurt me bad also. See App. 290.

89. I responded by telling Agents Garcia and Albritton the few things I thought I knew about Anderson. App. 176-178.

90. I believed I was "assisting" the agents under duress, not confessing.

91. Agent Garcia asked me if I had sent any child pornography to Agent Anderson. App. 182.

92. I replied by stating that although I sent Agent Anderson sexually explicit material, it "wasn't underage". App. 182.

93. I could not have sent Agent Anderson any child pornography, because I deleted it all before I began communicating with him. Compare Aff. ¶ 15 with id. ¶ 17, supra.

94. Agent Albritton further asked, "[a]re you going to have child pornography on your phone?" App. 183.

95. I replied, "[n]o." App. 183.

96. Towards the end of the interrogation, Agent Garcia asked me to sign a waiver of my Miranda rights. App. 194-196.

97. I did not sign the Miranda waiver, App. 215, because Agent Garcia's eagerness to have me sign the waiver made me suspicious.

98. I further chose not to sign the Miranda waiver because I believed that I did not willingly give the agents information.

99. I began to think something was amiss when I realized Agent Anderson's Range Rover was no longer in the parking lot. See App. 191 ("He – he had a – his vehicle was here…").

100. I tested my suspicions by asking to be uncuffed to ostensibly sign the waiver. App. 196.

101. Agents Garcia and Albritton acted all too eager to accommodate my signing of the waiver.

102. Agent Garcia attempted to trick me into signing the Miranda waiver by lying about the consequences of signing.

103. Agent Garcia claimed that my signing the waiver was "not an admission of guilt." App. 196.

104. When I ultimately refused to sign the Miranda waiver, Agent Garcia downplayed my refusal.

105. Agent Garcia stated that I "d[idn't] need to sign," and that "it [wasn't] a big deal…" – she simply wanted to "giv[e] [me] an opportunity to sign if [I] wanted to. App. 196.

106. After refusing to sign, I asked Agents Garcia and Albritton if "Nick [Agent Anderson]… might have been, himself, an agent." App.198.

107. Agents Garcia and Albritton seemed caught off-guard by my question.

A-7

108. Agent Garcia replied by stating, "[i]t's an ongoing investigation," and that their office had "reacted… on credible information." App. 198-199.

109. At this point, Agent Garcia ended the interrogation.

110. Subsequently, the U.S. Marshals, accompanied by Agent Garcia, escorted me to the Hillsborough County Jail for booking.

## IV. Initial Appearance

111. After spending the night in the Hillsborough County Jail, U.S. Marshals escorted me to the Tampa Federal Courthouse.

112. A U.S. Marshal booked me on the Fourth Floor of the courthouse, then placed me in a holding cell.

113. Several hours later, U.S. Marshals escorted me and no fewer than five other inmates to the courtroom of U.S. Magistrate Judge Amanda Arnold Sansone.

114. Magistrate Sansone called each inmate to the dock, one by one, to read them their rights and charges.

115. I noticed that each of the other inmates appeared to have counsel knowledgeable to the facts of their cases.

116. After their rights and charges had been read, Magistrate Sansone directed the Marshals to escort the other inmates to the holding cell - leaving only me.

117. No one informed me in advance of what would take place at this proceeding.

118. Magistrate Sansone commenced my Initial Appearance, and discovered that I was without counsel. Dkt. 5 at 4.

119. Magistrate Sansone further determined that I did not qualify for representation by the Public Defender's Office. Id. At 5.

120. Nevertheless, Magistrate Sansone "appointed the [PDO] for purposes of [Initial Appearance] only." Id.

121. Samuel Landes from the Tampa PDO represented me at the Initial Appearance. Id.

122. In a 90-second briefing, see Dkt. 5 at 6, Landes showed me the cover sheet of the Indictment, the text of 18 U.S.C. § 2422(b), and the potential length of imprisonment.

123. Once I saw the word "life" in the text of the statute, I went into shock.

124. Despite being the one who appointed Landes as my counsel, Magistrate Sansone warned me "to be very careful of what you discuss with [this] office." Dkt. 5 at 8.

125. I became lost and confused.

126. If I could not speak with the very counsel a judge appointed, who was I to turn to?

127. I could not have found, hired, and paid for private counsel in the 24 hours since my arrest: I was stuck with Landes.

128. Magistrate Sansone gave me approximately two weeks to find and retain counsel. Dkt. 5 at 11.

129. I wanted Magistrate Sansone to give me a continuance in order to secure my own private counsel for the Initial Appearance and Arraignment, as I originally requested. See Dkt. 5 at 5.

### V. Louderback

#### A. Hiring, Payment and "Arraignment"

130. After the Initial Appearance ended, U.S. Marshals escorted me to the Pinellas County Jail (hereinafter "PCJ") in Clearwater, Florida.

131. I lacked the funds to place any phone calls until my fifth day at PCJ.

132. I had no family or friends in the Tampa area to help me find counsel.

133. Eventually, a PCJ guard lent me a phone book.

134. I randomly contacted several local criminal defense attorneys based on their advertisements in the phone book.

135. One of the attorneys I spoke with recommended Frank Louderback, a criminal defense attorney based in St. Petersburg.

136. Louderback was the only attorney out of the six or seven I called who was willing to take my case.

137. Louderback first visited me at PCJ on February 21, 2018.

138. At this meeting, Louderback demanded a $50,000.00 payment – the entire amount – be paid in full before he would represent me.

139. I was running out of time, and no one else I spoke to would help – Louderback was my only choice for counsel.

140. It took approximately ten days to arrange the payment for Louderback's services; I was unable to pay him before the original Arraignment date of March 1, 2018. See Dkt. Nos. 10 and 11.

141. Louderback subsequently motioned to the court for a delay in the Arraignment, so he could ensure payment before appearing. Compare Dkt. 12 with Dkt. 11.

142. Louderback received his funds on or about March 2, 2018, and entered an appearance in my case on March 5, 2018. See Dkt. 13.

143. On March 5, 2018, Louderback visited me at PCJ, and "discussed" my case for the first time.

144. This "discussion" consisted of Louderback asking me to sign an Arraignment Waiver. See Dkt. 14.

145. Louderback told me that he would represent me at the hearing, that "[t]here's no need for you to be there" it would "just be another sweaty bus ride to Tampa".

146. Louderback never told me that the Arraignment had been cancelled. See Dkt. 14.

147. I do not understand why Louderback asked for a continuance of a hearing he knew would not take place.

148. Louderback also raised my hopes by telling me I might "qualify for Bond pending the outcome of the case".

149. I informed Louderback that due to my family arrangements, the chances of moving from Japan to Tampa were slim.

150. Nevertheless, Louderback proceeded with requesting Bond, which was ultimately denied. See Dkt. 21.

151. I later learned that Louderback lied about not having received discovery before the Bond Hearing. Compare Dkt. 20 at 14 contra USAO 16.

### B. March 22, 2018 Meeting

152. On March 22, 2018, Louderback visited me at PCJ.

153. At this meeting, Louderback discussed discovery and upcoming procedure. The first "advice" he gave me was, "[y]ou should have used a better screenname", and "that phone's gonna get you in trouble."

154. Louderback had with him a folder that was around an inch thick. He told me it was the paper-based discovery.

155. Louderback said, "You don't want to look at this, do you?" I never saw the folder again.

156. Louderback also mentioned recordings of my conversations with the "Fixer": the Skype calls.

157. Louderback explained how it would be a "pain in the ass" to arrange my viewing of the DVD-based discovery.

158. Louderback never discussed with me the contents of either the paper-based or DVD-based discovery.

159. Louderback never informed me that the government recorded the post-<u>Miranda</u> interrogation.

160. I entrusted Louderback to parse the discovery materials, because at the time I was neither emotionally prepared nor possessed enough knowledge about the law to have done so.

161. Louderback also failed to explain the elements of either Count of my Indictment: 2422(b) or 2252(a)(1)

162. Louderback informed me that my case had been assigned to the docket of District Court Judge Elizabeth A. Kovachevich.

163. Louderback warned me against going to trial, stating that "Judge "K" is strict", she "hates sex crimes", and "she'll give [me] 30 years or more" if I proceeded to trial.

164. Louderback further informed me that "the government ha[d] a warrant to search the iPhone".

165. When I asked Louderback about the best course of action regarding the iPhone, he gave me criminal advice: "[y]ou should have used a burner phone".

166. I asked Louderback if he could hire a forensic analyst to examine the iPhone. Louderback simply responded, "[w]e'll see".

167. I told Louderback that I wanted to speak to the government about information I had regarding child abusers and creators of child pornography. See PSR ¶ 16.

168. Louderback responded by saying that he would arrange a meeting.

169. In sum, the tone of the March 22, 2018 meeting left me feeling distrustful about Louderback's ability to fight my case.

170. On March 25, 2018, a female attorney from a Tampa law firm visited me at PCJ.

171. This attorney pointed out how the "optics" of a female judge, female prosecutor, and a male defense attorney representing a male defendant in a sex case crime case were "not good".

172. This attorney ultimately agreed to second-chair at my trial, if I chose to proceed to trial. Louderback consented to her assistance.

173. If I went to trial, I wanted a second, independent attorney there to ensure Louderback did a thorough job.

### C. Proffer

174. On April 10, 2018, I met with Louderback, Agent Garcia, and AUSA Thelwell at PCJ.

175. I presented Agent Garcia with a 9-page, handwritten dossier of information I believed would lead the government to no fewer than seven individuals[3] involved in child abuse-related activity.

176. In response, Agent Garcia presented me with a printed "buddy" list from my kik account. Agent Garcia asked me to identify users from this list whom I believed were involved in child abuse.

177. As I studied the list, Agent Garcia and Thelwell began interrogating me – an interrogation Louderback had neither warned me of nor prepared me for.

178. At one point, Thelwell laughed in my face and said, "[e]ven I know that deleted files remain on a phone for 30 days! Ha-ha-ha-ha-ha!".

179. As the meeting became acrimonious and talks broke down, Louderback did nothing to intervene: he appeared to be tacitly complicit with the government.

180. I ultimately signed a waiver granting the government permission to use my kik and Hotmail accounts, and I gave Agent Garcia the necessary usernames and passwords.

181. On April 12, 2018, Louderback visited me at PCJ.

---

[3] Not all individuals I had information on used kik. As a result, I could not have given Garcia the full range of information from her list alone.

A-12

182. Louderback informed me that the passwords I provided "didn't work", and the government intended to supersede my Indictment with perjury charges if I did not provide the correct ones.

183. I gave the government information that under such penalty of perjury was true and correct to the best of my knowledge.

184. I had been incarcerated for eight weeks. I had no way to change any passwords, nor were any friends or family aware these accounts existed.

185. Louderback subsequently informed me that the government obtained search warrants for the Dropbox and iCloud accounts in addition to the iPhone. App. 252; 263.

186. Louderback stated that the government further intended to supersede my Indictment with any results from these warrants if I did not plead guilty "by the end of the month [April]".

187. At this point, I lost faith in Loudeback's ability to properly defend me at trial; I decided to plead guilty.

188. On April 19, 2018, Louderback visited me at PCJ, and presented me with a written Plea Agreement to read, review, and sign.

189. I asked Louderback if he looked at the iPhone data. He responded, "I went to HSI and reviewed the forensics, and it is correct".

190. I was shocked to learn that Louderback went further than not hiring a forensics expert for the defense: he unconditionally accepted the government's data without any adversarial testing whatever.

191. As I studied the Plea Agreement, I showed Louderback several errors. See Dkt. 36 at 1, 3, and 24. Louderback replied, "[s]ign it anyway".

192. I was the only one who noticed any errors in the Plea Agreement: it was clear to me that Louderback did not read it.

193. Louderback even bragged about this fact to judge Kovachevich: "I didn't [even] make a coloring book out of it". Dkt. 96 at 3.

194. I did not learn that signing the error-ridden Plea Agreement was a mistake until the Change of Plea Hearing. See Dkt. 89 at 18-21 (contentions over elements of Count Two).

**E. Post-Plea**

195. On April 26, 2018, Louderback visited me at PCJ.

196. At this meeting, Louderback discussed my upcoming transfer to the Citrus County Detention Facility (hereinafter "CCDF") and what to say to the U.S. Probation Office (hereinafter "USPO").

197. The only advice Louderback gave regarding the USPO interview was, "[the office] will ask you questions about your background", and "[y]ou'll need to discuss your addiction to alcohol in order to qualify for the year off your sentence."

198. Louderback failed to mention that my charges rendered me ineligible for the one-year reduction in sentence for completing RDAP. See 28 C.F.R. §§ 550.55(b)(5)(iv) and (b)(6).

199. On May 2, 2018, Louderback and USPO Kasey Fuqua visited me at PCJ.

200. For several hours, I discussed my family history and background with USPO Fuqua.

201. Louderback said nothing; he merely sat and listened.

202. Louderback failed to inform me that the statements I made to USPO Fuqua would comprise the backbone of my PSR, a document that never goes away. See PSR ¶¶ 84-112.

203. On May 12, 2018, CCDF staff transferred me from PCJ to CCDF.

204. On July 3, 2018, I received my PSI in the mail.

205. On or about July 10, 2018, Louderback visited me at CCDF to discuss my PSR.

206. I implored Louderback to do something to help mitigate my recommended sentence of 292-365 months. See Dkt. 51 at 2.

207. I asked Louderback if he would write a sentencing memorandum. He responded by saying, "Judge "K" won't read it".

208. I asked Louderback if he could arrange for some of my family members to testify at sentencing. See Dkt. 52 at 22-44.

209. Louderback said he would "look into it", but no one showed up at sentencing.

210. Only after Louderback read my PSR did he realize that some mitigation evidence was necessary in my case after all. Dkt. 42 ¶ 3.

A-14

211. On August 9, 2018, Dr. Peter Bursten, a psychologist, visited me at CCDF. See Dkt. 57 at 19. Louderback was not present.

### F. Sentencing

212. On September 15, 2018, CCDF staff returned me to PCJ.

213. On September 18, 2008, Louderback visited me at PCJ to discuss the forthcoming Sentencing Hearing.

214. By this point, I had already decided to appeal my conviction.

215. On September 21, 2018, Rachael Reese from the Tampa law firm O'Brien Hatfield visited me at PCJ.

216. At this meeting, Reese discussed the procedure and possible grounds for direct appeal.

217. On October 9, 2018, Louderback visited me at PCJ for the last time.

218. I asked Louderback if he would object to the imposition of lifetime supervised release at sentencing.

219. Louderback replied, "[y]ou have a long sentence. The law is bound to change by then".

220. Two days before sentencing, I discovered a case where a similarly-situated defendant paid only $3,000.00 restitution for the same victims in my case. USPO set my restitution at $15,000.00. Compare PSR ¶ 131 contra Dkt. 79 at 2.

221. I phoned Louderback and informed him of my discovery. See Dkt. 57 at 7.

222. Had I not found this information, I would have had to pay $15,000.00 or more in restitution.

223. On October 25, 2018, District Court Judge Elizabeth A. Kovachevich held my sentencing hearing. Dkt. 57.

224. I wanted Louderback to object to the government's arguments regarding speculation of prior conduct, length of sentence, and lifetime supervised release. See Dkt. 57 at 71, 83. He did none of these.

225. On November 8, 2018, through Reese as Appellate counsel, I filed a Notice of Appeal. Dkt. 65.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual allegations and factual statements confirmed in this affidavit are true and correct to the best of my knowledge.

_____            August 13, 2022
William Brinson Ball                        Date

_____            August 13, 2022
Witness Signature                           Date


State of Florida
County of Sumter
Sworn to and signed before me on August 13, 2022 by William Ball

```
OLIVIA POLLARD
MY COMMISSION # HH 020452
EXPIRES: July 19, 2024
Bonded Thru Notary Public Underwriters
```

A-16

Davis
2 8 Davis Lane
Palm Bay, FL 32909

Retail

UNITED STATES
POSTAL SERVICE

34475

RDC 99

U.S. POSTAGE PAID
FCM LG ENV
PALM BAY, FL 32907
FEB 23, 2026

$2.44

S2324H504106-16

U.S District Court Ocala
205 NW 2nd St
Ocala, FL 34475

SCREENED
By USMS